UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

ISPAT INLAND, INC.,                    :
                                       :
                    Plaintiff,         :        05 Civ. 5401 (BSJ)
                                       :             **Order**
          v.                           :
                                       :
KEMPER ENVIRONMENTAL, LTD.             :
                                       :
                    Defendant.         :
---------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/20/09

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Ispat Inland, Inc. ("Plaintiff" or "Ispat"), an
Indiana steel company, brought this action against Defendant
Kemper Environmental, Ltd. ("Defendant" or "Kemper"), an
insurance underwriting corporation, seeking damages and
declaratory relief arising out of Plaintiff's claim for coverage
under an insurance policy issued by Defendant (the "Policy").
The parties disagree over whether the Policy provides coverage
for a settlement that Plaintiff entered into with various
governmental bodies regarding assorted environmental damage
claims. Before the Court are the parties' cross-motions for
summary judgment. For the reasons that follow, Plaintiff's
motion is GRANTED in its entirety, and Defendant's motion is
DENIED in its entirety.

## **BACKGROUND**[1]

Plaintiff Ispat has operated a steel-making facility in East Chicago, Indiana since the early 1900s. (Pl. R. 56.1 Statement at ¶ 1.)[2] The facility borders Lake Michigan and the Indiana Harbor Ship Canal ("IHSC"), a federal navigational channel that connects the Grand Calumet River ("GCR") with Lake Michigan. (Id.)

In 1993, Ispat entered into a consent decree with the United States Environmental Protection Agency following the release of hazardous substances in the area ("1993 Consent Decree"). (Id. at ¶ 13.) Under the 1993 Consent Decree, Ispat established a $19 million reserve fund for a Supplemental Environmental Project ("SEP" and "SEP Reserve") which would be used to dredge the ship canal. (Id. at ¶ 15.)

In October 1996, Ispat received a letter from a group of government agencies including the Indiana Department of Environmental Management, the Indiana Department of Natural Resources, the U.S. Department of the Interior, the U.S. Fish and Wildlife Service, and the U.S. National Park Service (collectively, the "Trustees"). (Salerno Decl. Supp. Pl. Mot. Summ. J. ("Salerno Decl.") Ex. M.) The letter informed Ispat that the Trustees had performed a pre-assessment screen, and it

---

[1] The following facts are undisputed unless otherwise indicated.
[2] Plaintiff operated until 1998 as Inland Steel Company. (R. 56.1 Statement at ¶ 1.) For ease of reference, the Court will refer to both Inland Steel Company and Ispat Inland Inc. as "Plaintiff" or "Ispat."

2

identified Ispat as a potentially responsible party ("PRP") for environmental damage of the river and harbor due to the release of hazardous substances (hereinafter "PRP Letter"). (Id.) The PRP Letter further advised Ispat that the Trustees intended to perform a Natural Resource Damage Assessment ("NRDA") pursuant to 43 C.F.R. § 11. (Id.) It invited Ispat to participate in the assessment, and also requested that Ispat fund all phases of the NRDA. (Id.)

Ispat subsequently joined eight other PRPs involved with the NRDA, and this group became known as the "G9." Part of the G9's efforts included communicating with the Trustees regarding credit for various environmental clean up efforts already underway in the area if the Trustees did find liability under the NRDA. Ispat wrote to the Trustees individually regarding gaining a credit for its $19 million SEP Reserve.

On May 27, 1998, Ispat's corporate parent, Ryerson Tull, Inc. ("Ryerson"), formerly Inland Steel Industries, Inc., sold Ispat to Ispat International, N.V. As part of the sales agreement, Ryerson was required to obtain environmental liability insurance. Defendant Kemper subsequently issued the Policy, which became effective on July 16, 1998, and named Ispat, Ryerson, and Ispat International, N.V. as insureds.

In January 2005, the Trustees eventually reached a settlement with the G9 which was approved by the United States

3

District Court for the Northern District of Indiana. The

settlement obligated Plaintiff to pay $8,300,940. Plaintiff did

not receive credit for any of the $19 million SEP Reserve to

offset its share of the settlement. Defendant Kemper

subsequently refused to provide coverage for Plaintiff's share

of the settlement, and Plaintiff initiated this suit.

## LEGAL STANDARD

Summary judgment is appropriate when no genuine issue of

material fact remains and the moving party is entitled to

judgment as a matter of law. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247-48 (1986). The moving party bears the burden

of making this showing. Marvel Characters, Inc. v. Simon, 310

F.3d 280, 286 (2d Cir. 2002). A fact is genuine when "the

evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Anderson, 477 U.S. at 248. A fact is

material if it "might affect the outcome of the suit under the

governing law." Id. Summary judgment is improper where the

evidence supports a reasonable inference that the nonmoving

party might prevail on the claim at issue. Chambers v. TRM Copy

Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

All factual disputes and inferences must be drawn in favor

of the nonmoving party. Anderson, 477 U.S. at 255. Nevertheless,

a nonmoving party may not merely rest upon conclusory

allegations or speculation, but must provide specific facts

4

evidencing a genuine issue for trial. Niagara Mohawk Power Corp.
v. Jones Chemical Inc., 315 F.3d 171, 175 (2d Cir. 2003). When
deciding cross-motions for summary judgment, the Court analyzes
each motion on its own merits, drawing all reasonable inferences
in the light most favorable to the nonmoving party. Heublein,
Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

## DISCUSSION

Plaintiff Ispat contends that the Policy covers the NRDA
Settlement according to its plain terms and Defendant Kemper is
therefore liable for the settlement amount. Kemper disagrees on
several grounds.

Defendant Kemper argues that the Policy does not cover the
NRDA settlement. First, Kemper alleges that Ispat fraudulently
induced Kemper to issue the Policy by representing that Ispat
would definitely receive credit for the SEP Reserve (infra, §
I.A). Second, Kemper argues that the PRP Letter constituted a
"claim" under the Policy prior to the Policy's coverage period
(infra, § I.B). Third, Kemper asserts that Ispat has not spent
the minimum retention amounts required under the Policy before
it can obtain coverage (infra, § I.C). And fourth, the Policy
precludes coverage because it constitutes damages,
administrative fines, or penalties (infra, § I.D).

Kemper also believes that the NRDA Settlement is not
covered under the Policy because: Ispat has not demonstrated the

reasonableness of the amount of the settlement or Ispat's portion of it (infra, § II), recovery from Kemper would constitute a double recovery for Ispat (infra, § III), the settlement prejudiced Kemper's subrogation rights under the Policy (infra, § IV), and attorney's fees incurred in conjunction with the Settlement is improper (infra, § V).

## I. Whether the Policy Covers the NRDA Settlement

### A. Fraudulent Inducement

Kemper argues that Ispat misrepresented the nature of the anticipated liability under the NRDA. (Def. Mot. Summ. J. at 5-10.) Ispat allegedly stated that pursuant to an agreement with the EPA, it would receive "credit" for the SEP Reserve when the Trustees determined its liability under the NRDA. Kemper similarly claims that Ispat's failure to reveal all material facts relating to the NRDA when negotiating the Policy — i.e., the uncertainty of receiving credit with the EPA — violated "Exclusion 7" of the Policy.[3]

Ispat contends that it informed Kemper that the SEP Reserve might not be applied to the NRDA, and that it merely hoped it would receive credit for the reserve. Ispat argues that it would

---

[3] Exclusion 7 excludes from coverage under the Policy conditions known by Ispat prior to the Policy period and arising from pollution conditions, unless "all of the material facts relating to [it] were disclosed to [Kemper] in the application and other supplemental materials . . . and information prior to the inception of th[e] Policy." (Salerno Decl. Ex. A at Policy Section IV Exclusions ¶ 7.) Because Kemper's claims relating to fraudulent inducement and Exclusion 7 are so similar, the Court considers both claims together.

6

have been unreasonable for Kemper to rely on any alleged
misrepresentations to the contrary, because documents reviewed
by and available to Kemper would have undermined any such
misrepresentations.

The Court agrees with Ispat that any reliance by Kemper on
statements by Ispat would have been unreasonable. A claim for
fraud in New York must show by clear and convincing evidence:
(1) the knowing or reckless misrepresentation of a material
fact; (2) that such misrepresentation was intended to induce a
party's reliance; and (3) that the party relied on the
misrepresentation and thereby suffered damages. Merrill Lynch &
Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir.
2007). A party claiming fraud by omission must also show that
the other party had a duty to disclose the fact at issue. Id.
The Court assumes that Exclusion 7 in the Policy imposed such a
duty on Ispat regarding the credit issue.

Reliance on the representations or omissions by another
party must be reasonable to sustain a fraud claim. Id. In
ascertaining the reasonableness of a party's reliance the Court
must consider "the entire context of the transaction, including
factors such as its complexity and magnitude, the sophistication
of the parties, and the content of any agreements between them."
Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343
F.3d 189, 195 (2d Cir. 2003). Furthermore, a claim for fraud

will not succeed where "a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without ... inserting appropriate language in the agreement for his protection." Id. (citations omitted). Reliance in such circumstances is not reasonable, because it is the party's "own evident lack of due care which is responsible for his predicament." Id. (internal citation omitted). A sophisticated business party cannot prevail on a fraud claim where it "enjoy[ed] access to critical information but fail[ed] to take advantage of that access." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997).

The Court finds that any reliance by Kemper on alleged misrepresentations by Ispat would have been unreasonable, and thus the Court need not determine whether in fact Ispat misled Kemper. Both parties were clearly sophisticated business entities, and the issuance of the Policy, for a premium of more than $1,400,000 (Salerno Decl. Ex. A at Declarations Item X), was a complex transaction involving complicated issues. Ispat provided Kemper notice regarding several material issues, and Kemper enjoyed wide access to information concerning Ispat. For example, Steve Piatkowski, Kemper's engineer who was primarily responsible for collecting information relevant to the Policy, toured Ispat's facility on May 11-12, 1998. (Def. Reply to Pl.

R. 56.1 St. ¶¶ 27-29.) Susan Doering, another Kemper employee
involved with this process, joined Mr. Piatkowski for one of
these days, during which time they met with Ispat's
environmental experts. (Id.) During these meetings the parties
discussed a range of Ispat's environmental risks, including the
1993 Consent Decree, the SEP, the $19 million SEP Reserve, the
NRDA, the G9, and the anticipated dredging project. (Id. ¶ 30.)
Before issuing the Policy, Kemper reviewed the 1993 Consent
Decree (id. ¶ 37) and the PRP Letter (id. ¶ 36), and Mr.
Piatkowski testified that he reviewed Ispat's 1996 Form 10-K
(Salerno Decl. Ex. KKK at 285). Mr. Piatkowski was also familiar
with NRDA proceedings, and Ms. Doering also had some experience
with them. (Def. Reply 56.1 ¶¶ 38-39.)

Plaintiff also provided Defendant with a number of
documents that should have signaled to Kemper that accepting
Ispat's assertions without conducting its own inquiries would be
unreasonable. First, the 1993 Consent Decree plainly states that
"Inland agrees to spend $19 million to perform the [SEP]."
(Salerno Decl. Ex. HH at 73.) The Consent Decree also prohibited
Ispat from using any part of the $19 million SEP Reserve towards
amounts required under "any actions which represent a sound
business practice to [Ispat], i.e., actions from which [Ispat],
rather than the public, is likely to receive the substantial
benefit." (Id. at 84.) Although this limitation does not

directly prohibit a possible credit for the NRDA, it should have signaled to Kemper to conduct its own inquiries.

Second, Ispat's 1996 Form 10-K states that the 1993 Consent Decree includes "sediment remediation ... estimated to cost approximately $19 million over the next several years," and notes that Ispat has established a reserve to cover this liability. (Id. Ex. L at 12.) It further states that because "neither the nature and extent of the contamination nor the corrective actions can be determined" until after an assessment, Ispat "cannot presently reasonably estimate the costs of or the time required to complete such corrective actions." (Id.) Kemper argues that these statements show that the amount required under the SEP was undetermined, and thus the SEP Reserve could be used on other matters, including the NRDA. (Kemper's Reply 56.1 ¶ 42.) To the contrary, the statements in Ispat's Form 10-K should have prompted Kemper to investigate these claims for themselves.

Third, Kemper reviewed the PRP Letter, which plainly showed that it did not involve the same governmental parties as the NRDA, and that Ispat was not the only PRP. Because of this attenuated relationship between the SEP and the PRP Letter, Kemper should not have simply relied on Ispat's alleged assertions.[4] When studied as a whole, these documents should

---

[4] Kemper argues that Ispat committed material omissions by, inter alia, not providing a December 1997 letter from Mr. Gary Allie to the Indiana Department of Environmental Management, one of the NRDA Trustees. (Cert. Lisa

10

have prompted Kemper to investigate Ispat's alleged claim regarding the credit issue.

Under these facts, Kemper's reliance was unreasonable and resulted from its own lack of reasonable care. The credit issue constituted a material fact, yet Kemper itself admits that it did not conduct any independent investigations regarding the veracity of Ispat's representations on this subject. (Def. Reply 56.1 ¶ 49.) Instead, Kemper argues that it was entitled to rely on the information provided to it by Ispat, pursuant to Ispat's insurance application. (Id.) Assuming *arguendo* that the insurance application, which was not provided to the Court, stated that Kemper was entitled to rely on representations by Ispat without further investigation, this would not change the Court's conclusion. Even where a written agreement states that one party is entitled to rely on the truth of the other party's statements and purports to relieve that party of its burden to verify facts, a party cannot reasonably rely on representations that it had reason to know are false, or that it accepted with knowing blindness. Merrill Lynch, 500 F.3d at 181-82.

---

Thaviu Supp. Kemper's Mot. Summ. J. Ex. I.) In that letter, which was written before Ispat began negotiations with Kemper, Mr. Allie stated that Inland assumed that it would receive a credit for the SEP Reserve in the determination of any liability under the NRDA. (Id. at 2.) As discussed supra, however, Kemper should have investigated the credit issue even in the absence of this letter or similar documentation.

11

Accordingly the Court finds that no issue of fact exists regarding whether Kemper reasonably relied on any alleged misrepresentations or omissions by Ispat.

## B. Whether the PRP Letter Constituted a "Claim" Before the Policy Period

Defendant argues that the PRP letter that Ispat received from the Trustees is a claim made outside the policy period. The Policy only covers claims made during the policy period, from July 16, 1998 to July 16, 2003 (Salerno Decl. Ex. A at Policy Definitions ¶ H), and the PRP Letter to Ispat is dated October 18, 1996. (Id. Ex. M.) The Policy defines a "claim" as "the written assertion of a legal right alleging liability or responsibility on the part of the Insured arising out of Pollution Conditions, and shall include but not necessarily be limited to lawsuits or petitions filed against the Insured." (Id. Ex. A at Policy Definitions ¶ D.)

At first blush it is unclear whether the PRP Letter falls within the ambit of the Policy's definition of a "claim." The PRP Letter states that the Trustees identified Ispat as a potentially responsible party after a preliminary assessment concluded that a hazardous substance was released into the GCR/IHSC. The Letter invites Ispat to voluntarily participate in the assessment process, and it requests Ispat to fund all stages

12

of the process. The Letter does not explicitly state that Ispat is liable or responsible for environmental damage.

When interpreting a contractual provision in an insurance contract, New York courts look to the meaning of the contract as a whole to decipher the parties' intentions. See Evanston Ins. Co. v. GAB Bus. Servs., Inc., 132 A.D.2d 180, 185, 521 N.Y.S.2d 692, 692 (1st Dep't 1987). Unambiguous terms are interpreted according to their "plain and ordinary" meaning. State of N.Y. v. Blank, 27 F.3d 783, 792 (2d Cir. 1994). A term is ambiguous where it could plausibly suggest more than one meaning to a reasonably intelligent person who has reviewed an entire agreement, and who is familiar with the terminology used in a specific type of business. Sayers v. Rochester Telephone Corp. Supplemental Management Pension, 7 F.3d 1091, 1095 (2d Cir. 1993). Whether or not ambiguity exists is a question of law to be decided by the courts if no extrinsic evidence will resolve its meaning. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004).

The meaning of a "claim" under the Policy is ambiguous as applied to the PRP Letter. The parties have not shown that any extrinsic evidence will assist in deciphering their intended meaning of the term "claim" in the Policy, and the Court will therefore decide this issue as a matter of law.

13

New York courts have not supplied a generally accepted definition of a "claim" in the insurance context. In re Ancillary, 55 A.D.3d at 47. But the Second Circuit in diversity cases has developed some case law on this issue. See Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215-16 (2d Cir. 1999)(collecting cases).

The Second Circuit has interpreted a "claim" as "an assertion by a third party that in the opinion of that party the insured may be liable to it for damages." Am. Ins. Co. v. Fairchild Indus., Inc., 56 F.3d 435, 439 (2d Cir. 1995) (citation and quotation marks omitted). Additionally, a claim is "a demand for specific relief owed because of alleged wrongdoing," and is not "an accusation that wrongdoing occurred ... a naked threat of a future lawsuit ... or a request for information or an explanation." Windham Solid Waste Mgmt. v. Nat'l Cas. Co., 146 F.3d 131, 133-34 (2d Cir. 1998).

A claim is thus more than a mere statement informing a party of potential liability. See Windham, 146 F.3d at 132-33; Fairchild, 56 F.3d at 437-38. For example, in Windham, the issue was whether several letters constituted a claim made prior to an insurance coverage period. There, the Second Circuit found that a claim had been asserted because the letters explained that appellant would definitely be responsible for the environmental cleanup at issue. Windham, 146 F.3d at 134. The Second Circuit

14

in Fairchild also considered whether a letter constituted a claim when it stated that a party "could be liable for cleanup costs" under various statutes. Fairchild, 56 F.3d at 437. The court declined to hold that the letter stated a claim, instead concluding that a claim had been asserted during the relevant time period because negotiations between the parties after the date of the letter revealed that the government agency conclusively sought to compel cleanup. Id. Thus, in both of these cases the Second Circuit found that a claim existed once one party affirmatively asserted that the other party was liable.[5]

The instant case differs because the NRDA was the very means by which the Trustees sought to determine liability. The PRP Letter merely invited Ispat to participate in the assessment process; it did not compel or seek to compel Ispat to conduct clean up efforts or pay damages. While the Trustees requested Ispat to fund all stages of the assessment process, they did not require Ispat to do so or threaten any consequences if Ispat declined. Indeed, NRDA trustees may not present a demand for damages to a PRP until after the conclusion of the actual assessment. 43 C.F.R. § 11.91(a). As late as April 1999, the

---

[5] In analogous cases where the issue was whether a demand letter constituted a "suit" or not, courts have held that "[a] request to participate voluntarily in remedial measures is not the same as the adversarial posture" inherent in a lawsuit. Avondale Indus., Inc. v. Travelers Indem. Co., 887 F.2d 1200, 1206 (2d Cir. 1989).

15

Trustees and Ispat signed a tolling agreement in which the Trustees refer to the NRDA as having "potential claims" and state only that the Trustees "intend[] to assert certain civil claims" against Ispat. (Salerno Decl. Ex. V at 1.) In fact, the NRDA was still proceeding in March 2000. (See id. Ex. MM at 1.)[6]

Accordingly, the PRP Letter did not constitute a "claim," and Ispat's claim for coverage of the NRDA Settlement under the Policy is not barred on this basis.

## C. **Whether Ispat Satisfied the Retention Amounts Under the Policy**

Self-insured retention amounts ("SIRs") in the Policy require Ispat to spend certain minimum amounts of money in some circumstances before coverage under the Policy is triggered. Ispat is claiming the NRDA Settlement falls under "Coverage A" and "Coverage C" of the Policy. Coverage A of the Policy entails insurance "for bodily injury and property damage" and requires a $250,000 SIR before the Policy is triggered. (Salerno Dec. Ex. A

_____

[6] Likewise, deposition testimony by Ispat employees that they believed Ispat was, or that it eventually would be, held liable under the NRDA, is irrelevant to this analysis. It is also irrelevant that Ispat hired counsel after receiving the PRP Letter, as Kemper argues. See In re Ancillary Receivership of Reliance Ins. Co., 55 A.D.3d 43, 49, 863 N.Y.S.2d 415, 415 (1st Dep't 2008) (finding that despite the fact that a suit was eventually commenced against plaintiff, and that plaintiff was aware of facts that it knew might eventually lead to litigation, post hoc reasoning did not support a finding that the letter constituted a claim). Whether a PRP Letter constitutes a claim "does not depend upon a party's understanding of what it received ... but on the actual substance of what it received." NL Indus., Inc. v. Commercial. Union Ins. Co., No. 90 Civ. 2125, 1993 U.S. Dist. LEXIS 21463, at *10-11 (D. N.J. May 27, 1993).

at 1.)[7] Coverage C entails insurance "for environmental clean up
costs" and provides four specific retention amounts for four
types of Coverage C claims: two for work required under the 1993
Consent Decree, one for off-site disposal of hazardous wastes,
and one for removal of asbestos and PCBs).... [of] all
environmental incidents." (Id. at 1-2.)[8] Coverage C claims that
do not fall within one of the four specific retention levels are
not subject to a retention amount. (Id.)

Kemper argues that the Policy provided coverage for the
NRDA Settlement only under Coverage C and further asserts that
such coverage was subject to a $19 million SIR. This claim
refers to a Policy provision that states that environmental
incidents "relating to the [SEP] required under the 1993 Consent
Decree" will have a SIR "not less than" $19 million. (Id.)
Kemper's argument is without merit. Plaintiff's SEP obligation

---

[7] Under the Policy, "Property damage means: (1) physical injury to or
destruction of tangible property including the resulting loss of use thereof;
or (2) loss of use of tangible property that has not been physically injured
or destroyed; provided that such physical injury or destruction or loss of
use are caused by Pollution Conditions." (Salerno Decl. Ex. A. at Policy
Definitions ¶ P.)
    "Pollution Conditions means a discharge, dispersal, [or] release ...
[of] contaminants or pollutants into ... any watercourse or body of water
...." (Id. ¶ O.)
[8] "Environmental Clean Up Costs means expenses incurred for the investigation,
removal, disposal or treatment of Pollution Conditions pursuant to
Environmental Standards." (id. ¶ G.)
    "Environmental Standards means any legislatively or administratively
enacted law, rule, regulation or order applicable within the jurisdiction
...." (Id. ¶ I.)
    "Environmental Incident means either a claim made against the insured,
during the policy period, as a result of pollution conditions, or the
insured's discovery during the policy period of pollution conditions. (Id. ¶
H.)

17

and the NRDA Settlement resulted from different proceedings with different purposes, involving different government entities. The SEP was one component of a 1993 Consent Decree between Ispat and the EPA, while the NRDA Settlement commenced three years after the approval of the decree, did not involve the EPA, and included a far broader study area than the SEP. The $19 million SIR provision in the Policy does not apply to the Settlement.

The Court further finds that the NRDA Settlement constituted both "environmental clean up costs" and "property damage" under Coverages A and C of the Policy. The NRDA Settlement constituted "environmental clean up costs" because it was a payment to remedy pollution caused by the release of oil and hazardous substances into the GCR/IHSC. The Settlement did so pursuant to an "environmental standard" because consent decrees constitute judicial orders and various administrative agencies signed the 1993 Consent Decree. See Brennan v. Nassau County, 352 F.3d 60, 63 (2d Cir. 2003). The Settlement also constituted "property damage" because it concerned physical injury and loss of use of the GCR/IHSC. (See Salerno Decl. Ex. LL.) Indeed the 1993 Consent Decree entered pursuant to the NRDA Settlement states that the settling parties "are liable for Response Costs and damages for injury to, destruction of, or loss of Natural Resources ... resulting from releases of Hazardous Substances and/or Oil into or within the [GCR/IHSC]."

18

(Id. Ex. QQ. at 7.) The consent decree further states that the
entire settlement "shall be used by the Trustees to plan and
implement projects to restore, replace, or acquire the
equivalent of natural resources injured at the GCR/IHSC Riparian
Site." (Id. at 19.)

Ispat also satisfied the applicable SIRs. Ispat satisfied
the $250,000 SIR required by Coverage A through its first
payment for $400,940 made pursuant to the NRDA Settlement on
April 29, 2005. (Salerno Decl. Ex. SS.)[9] Ispat also satisfied any
SIR that may have been required of Coverage C. Even assuming
*arguendo* that Ispat must pay a $19 million SIR before recovering
under Coverage C, Ispat's existing SEP obligation would satisfy
that retention amount and trigger Kemper's duty to indemnify the
liability that Ispat has incurred for the NRDA.

Accordingly, the Court finds that no material fact exists
as to whether Ispat has satisfied the SIRs applicable to the
Settlement.

## D. **Whether the Policy Precludes Coverage for the NRDA Settlement Because it Constituted Damages, Administrative Fines, or Penalties**

Kemper argues that the NRDA Settlement is not covered under
the Policy because it constituted "damages," not "environmental

___

[9] Kemper also questions whether Ispat made its first annual payment, and
whether the second annual payment was made pursuant to the Settlement. Ispat
provides email correspondence showing that it made the first payment, and a
wire transfer document showing that it made the second payment. (Id. Exs. SS-
UU.)

19

clean up costs" as defined in Coverage C, and may also have constituted in part penalties and administrative costs. Kemper argues that because the Trustees have discretion over how they use the settlement money, the NRDA Settlement is an assessment or penalty, not an environmental clean up cost.

The Court rejects this argument because the Policy does not exclude coverage for damages. An endorsement attached to the Policy removed a clause originally in the Policy that excluded coverage for sums incurred due to "civil, administrative or criminal fines or penalties, assessments, punitive, exemplary or multiplied damages, or non-pecuniary relief." (Salerno Decl. Ex. A at Endorsement No. 3.) The Policy does not otherwise mention or exclude damages from its coverage. Thus, even if the Court considers the NRDA Settlement as damages, fines or penalties, such would be included in the Policy's coverage.[10]

The Court finds that no issue of fact exists on this or any issue relating to whether the Policy covers the NRDA Settlement.

## II. The Reasonableness of the NRDA Settlement

Kemper asserts that Ispat cannot prove that the NRDA Settlement was reasonable because Ispat is withholding documents

---

[10] The Court therefore need not consider Kemper's argument that Ispat withheld documents relating to penalties and administrative costs. Kemper also has not shown that funds provided to third parties to remedy environmental issues are excluded from coverage, aside from the deposition testimony by one of Defendant's own representatives. The Policy in fact specifically provides coverage for settled claims (id. at Endorsement No. 9), and therefore the Court rejects this argument.

on the basis of the attorney-client privilege. Kemper challenges
the reasonableness of both the total amount the G9 determined it
would pay in settlement, and Ispat's portion of this settlement.
Kemper has not supplied any evidence demonstrating that the
Settlement was unreasonable, however, and Ispat has provided
some evidence to the contrary. The Court therefore finds that no
genuine issue of material fact exists regarding this issue.

Defendant does not provide any evidence to challenge the
reasonableness of the overall amount of the NRDA Settlement.
Ispat claimed attorney-client privilege over the G9's internal
discussions regarding this amount. Kemper moved to compel the
production of documents related to these discussions, but the
magistrate judge denied this request. (Aug. 16, 2006 Order.)
Kemper renewed its motion, but the magistrate judge again denied
it. (Apr. 23, 2007 Order.) Kemper failed to timely appeal this
order, and it may not do so now. Fed. R. Civ. P. 72(a).

While Kemper fails to provide any evidence that
demonstrates the unreasonableness of the NRDA Settlement, Ispat
makes a contrary showing in the form of documentary evidence.
Ispat provides correspondence between the G9 and the Trustees
demonstrating that they negotiated several aspects of the damage
assessment, including: gaining credit for ongoing and related
clean up efforts by the G9 (Salerno Decl. Ex. II at 2);
characterizing the baseline of the GCR/IHSC as an industrial

waterway (id. at 3); maximizing the efficiency of the assessment process (id. at 6); and ensuring that all responsible parties are involved (id. Ex. MM at 3). Ispat also notes that negotiations of the Settlement occurred over a significant amount of time. Nearly two years passed between the Trustees' settlement proposal in 1999 and the parties' agreement on the basic terms of a settlement in 2001. (Id. Exs. LL, OO.) Three more years then passed before the parties submitted a proposed consent decree to the United States District Court for the Northern District of Indiana in 2004. (Id. Ex. QQ.) One U.S. Department of Justice attorney noted in a letter to members of the G9 that "[u]nder the proposed Consent Decree, the [G9] will pay sums that are substantial but far less than the full amount needed to clean up those areas." (Id. Ex. PP. at 1-2) Therefore the Court finds that no issue of fact exists whether the amount of the NRDA Settlement was reasonable.

Kemper also does not provide any evidence showing that an issue of fact exists regarding the reasonableness of Ispat's portion of the Settlement.[11] Ispat, however, provides evidence that its portion of the Settlement was reasonable, and that it sought to keep its portion as low as possible. It notes that one

---

[11] Kemper was not precluded from inquiring into allocation of the Settlement among the G9 during depositions. (Pl. Opp. to Def. Summ. J. at 22 (quoting Aug. 14, 2006 Hearing Tr. of Magistrate Judge Pitman).). Ispat has also maintained that no documents exist regarding allocation. (Id.) Kemper's argument that Ispat must provide more evidence of the allocation's reasonableness is rejected.

or more members of the G9 proposed that Ispat's share of the
Settlement should be $15-$16 million. (Id. Ex. J at 330:17-
331:7.). Ispat also sought credit for the SEP Reserve and it
commented individually on the NRDA assessment process with the
Trustees. (Id. Ex. JJ.) Therefore the Court finds that no issue
of fact exists whether Ispat's portion of the NRDA Settlement
was reasonable.

**III. Whether the NRDA Settlement Constituted Double Recovery**

Kemper argues that allowing Ispat to recover for the NRDA
Settlement would amount to double recovery. Kemper bases its
argument on a September 2003 settlement between Ispat and its
corporate parent, Ryerson, which paid Ispat $21 million for
various disputes, principally involving "pre-sale pension
contributions." (Def. Ex. M (Answer to Interrogatory No. 2).)
Kemper claims that because Ispat did not divulge the details of
such settlement, Kemper has no means of knowing whether Ispat
would receive a "double recovery" for the NRDA Settlement. (Def.
Mem. Law Supp. Mot. Summ. J. 25-26.) Kemper insists that Ispat
must show how much of the settlement with Ryerson related to the
NRDA. Kemper's argument here is unclear, and the Court
interprets it to mean that if Ispat recovers any sums due
Ryerson, these amounts exceed what Ispat rightfully deserves.

This argument is without merit. Along with Ispat and Ispat
International, N.V., Ryerson was one of the three "insureds" in

23

the Kemper Policy. One of the terms of that 2003 settlement agreement provided that Ryerson would assign its rights in the Policy to Ispat. (See Pl. Form 10-K for 2004 at 12.) This released Ryerson from its right to coverage under the Policy relating to the NRDA. Therefore, whether or not any amount of the NRDA Settlement would have been due to Ryerson is irrelevant. When Ispat brought this insurance coverage claim against Kemper, it had its own rights as a named insured on the Policy and, as an assignee of Ryerson, also had Ryerson's rights in the Policy. SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC, 394 F.Supp.2d 585, 594 (S.D.N.Y. 2005)(stating that the "assignee steps in the shoes of the assignor" and gains "that to which the assignor is entitled"). Accordingly, the Court concludes that no material issue of fact exists on this issue.

## IV. **Whether the NRDA Settlement Prejudiced Kemper's Subrogation Rights**

Kemper argues that its subrogation rights were prejudiced when Ispat settled, without Kemper's consent, claims relating to the NRDA with at least one of its other insurers. An "insurer's right of subrogation ... [applies] to claims against third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." Pa. Gen. Ins. Co. v. Austin Powder Co., 68 N.Y.2d 465, 471 (N.Y. 1986). Subrogation thus reduces the amount that an insurer expends in providing coverage, by

permitting the insurer to recover money from a wrongdoer that
contributed to the liability incurred by the insured. Ocean
Accident & Guar. Corp. v. Hooker Electro-Chemical Co., 240 N.Y.
37, 47 (N.Y. 1925). Kemper contends that under New York law,
when an insured settles without their insurer's consent, the
insured may not recover from the insurer. Accordingly, Kemper
asserts that Ispat may not recover from Kemper to the extent
Ispat settled claims relating to the NRDA covered by Ispat's
other insurers.

   Kemper fails to provide any evidentiary support for its
factual allegations that Ispat allegedly prejudiced Kemper's
subrogation rights under the Policy. It is well settled under
New York law that the defendant bears the burden of proving that
the Plaintiff has breached a policy condition. A.L. Sonn Brush
Co. v. The Lumber Mut. Fire Ins. Co., 291 N.Y.S. 324, 324 (N.Y.
App. Div. 1936). Kemper falls short of meeting that burden.
Kemper has not provided any other insurance policies, any
details regarding the claim for coverage, the outcome of the
claims, or how Kemper accordingly would pay more than its share
by covering Ispat's liability under the NRDA. Although Kemper
claims that it lacks access to documents to substantiate this
claim, the evidence that they have presented is insufficient to
sustain summary judgment. Thus Kemper has failed to demonstrate
why the amount it must pay Ispat for the NRDA Settlement should

be reduced by amounts Ispat received from other insurers, or that it is entitled to summary judgment on this basis.

## V.   Attorney's Fees

Finally, Ispat requests attorney's fees incurred in connection with the NRDA Settlement under "Coverage D" of the Policy. As already discussed, Kemper believes that Ispat is only entitled to Coverage C because the PRP Letter constituted a claim before the Policy's coverage period. The Court rejected this argument.

Coverage D of the Policy obligates Kemper to pay on behalf of Ispat "Legal Defense Expense[s] incurred in the investigation, adjustment or defense of Claims or Environmental Clean Up Costs, subject to the Limits of Liability and Retention Amounts." (Salerno Decl. Ex. A § I Insuring Agreements ¶ D.) The Policy defines Legal Defense Expense to include attorney's fees. (Id. § II Definitions ¶ L.) No SIRs apply to legal fees.[12] Accordingly, Ispat is entitled to attorney's fees incurred pursuant to the NRDA Settlement, and no issue of fact exists on this question.

---

[12] Instead, SIRs only apply to the underlying claims: the Policy provides that "[a]ll Claims, Contract Damages, Environmental Clean Up Costs or Legal Defense Expense[s] which involve the same or related Pollution Conditions shall be considered a single Environmental Incident." (Id. Section VI Retentions ¶ C.) As discussed supra, Ispat satisfied any retention amounts applicable to the NRDA Settlement.

26

**CONCLUSION**

For the foregoing reasons, Plaintiff Ispat's motion for

summary judgment is GRANTED and Defendant Kemper's motion for

summary judgment is DENIED. Ispat may file an application for

attorney's fees to the Court within fourteen days of this

judgment pursuant to Fed. R. Civ. P. 54(d)(2). The Clerk of the

Court is directed to close the case.

SO ORDERED:

BARBARA S. JONES

**UNITED STATES DISTRICT JUDGE**


Dated:    New York, New York
          November 20, 2009